IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RUTH VINSON, | ) | CASE NO.  1:15-cv-01788 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Ruth Vinson ("Plaintiff" or "Vinson") seeks judicial review of the final decision

of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties. Doc. 17.   As explained more fully below, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

Vinson filed an application for Disability Insurance Benefits ("DIB") on or about

December 1, 2011.[1]  Tr. 9, 60, 70, 137, 155.  Vinson alleged a disability onset date of July 30,

2009. Tr. 9, 60, 137.  She alleged disability due to bipolar disorder and asthma.[2]  Tr. 60, 71, 72,

85, 89, 159, 189.  Vinson's application was denied initially (Tr. 60-70, 85-87) and upon

reconsideration by the state agency (Tr. 71-84, 89-91).  Thereafter, she requested an

---

[1] The record supports an application filing date of either December 1, 2011, or December 2, 2011.

[2] Vinson's arguments do not relate to her alleged disability based on asthma.

administrative hearing.  Tr. 96-97.  On July 24, 2013, Administrative Law Judge Peter R. Bronson ("ALJ") conducted an administrative hearing.  Tr. 27-59.

In his September 19, 2014, decision (Tr. 6-26), the ALJ determined that Vinson had not been under a disability at any time from July 30, 2009, through September 30, 2012, when she was last insured for a period of disability and disability insurance benefits.  Tr. 10, 22.  Vinson requested review of the ALJ's decision by the Appeals Council.  Tr. 5.  On July 10, 2015, the Appeals Council denied Vinson's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

**A.  Personal, vocational and educational evidence**

Vinson was born in 1955.  Tr. 31, 137.  She was married and living with her husband of 34 years at the time of the administrative hearing.  Tr. 32.  In 2000, Vinson received a bachelor's degree in science and education from Cleveland State University.  Tr. 31.  She last worked in July 2009 as a teacher.  Tr. 31.

**B.  Medical evidence[3]**

**1.  Treatment history**

In January 2006, Vinson was seen at Lakewood Hospital's emergency room because she was expressing delusional thinking and suicidal ideation.[4]  Tr. 243-244.  Vinson appeared confused, was not acting her normal self, and was not eating.  Tr. 243.  Vinson made attempts to harm herself even while in the Psychiatric Unit. Tr. 243.  In one instance, Vinson attempted to stuff a rag down her throat.  Tr. 243.  In another instance, she stabbed her arm repeatedly with a

---

[3] To be entitled to DIB, Vinson must demonstrate that she was disabled prior to or no later than her date last insured. 20 C.F.R. §§ 404.315(a)(1), 404.320(b)(2).  Thus, the relevant time period for Vinson's DIB application is July 30, 2009, her alleged disability onset date, to September 30, 2012, her date last insured.

[4] The attending physician was Dennis Savinsky, M.D.  Tr. 243-244.  During her admission, Vinson was admitted to the psychiatric floor and seen by Kishor Patel, M.D.  Tr. 253-254.

pen. Tr. 243. Vinson claimed to not feel particularly depressed, but believed that her thinking was "somewhat speeding up." Tr. 243. She also believed that all of her fifth grade students were using cocaine. Tr. 243. Up until the time of admission, Vinson had been relatively stable. Tr. 243. There was no evidence of mania and she had no difficulty at work or problems in her social life or marriage. Tr. 243. Vinson had been treated in the past for depression. Tr. 243. Upon examination, Vinson's speech was appropriate and she denied any symptoms of depression. Tr. 243. She displayed paranoid delusions and her insight and judgment were impaired. Tr. 243. When seen by Dr. Patel for a psychiatric consult on January 29, 2006, Dr. Patel's diagnoses included a diagnosis of depression. Tr. 253. She was started on psychotropic medications. Tr. 243. Vinson's condition stabilized (Tr. 243) and she was discharged on February 1, 2006 (Tr. 243-244). On discharge, she was sleeping well and was compliant with her medication. Tr. 243-244. Vinson's final diagnoses were bipolar disorder, suicidal ideation and erythema nodosum. Tr. 244. She was prescribed Risperdal, Trileptal and Lexapro. Tr. 244. No alcohol was detected in Vinson on this visit. Tr. 261.

In January and April of 2008, Vinson saw her psychiatrist Diane Dale, M.D.,[5] reporting that she had no complaints and was basically fine. Tr. 309-310. Thereafter, on May 14, 2008, Vinson was seen at the emergency room with complaints of suicidal thoughts, depression and hallucinations. Tr. 262-273. She claimed that she had been hearing voices that made her believe that the television was sending her messages and the only way to stop it is through suicide. Tr. 263. She also stated that she and her husband should die together so neither one of them suffered. Tr. 263. At the time of this visit, Vinson's father had recently passed away and Vinson had not been taking her medication for a week. Tr. 264, 269. She was diagnosed with bipolar disorder. Tr. 270. Lab work did not detect alcohol. Tr. 272. Vinson was hospitalized for five

---

[5] Dr. Dale first saw Vinson on August 9, 2006. Tr. 275.

days.  Tr. 308.  She saw Dr. Dale for follow up on May 27, 2008.  Tr. 308.   Vinson reported seeing things on television with subliminal pictures and reported that people were talking about her.  Tr. 308.  Dr. Dale increased Vinson's Risperdal.  Tr. 308.  When Vinson saw Dr. Dale in August 2008, Vinson was stable with no acute psychological symptoms.  Tr. 307.  She reported that she was happy to be back at work.  Tr. 307.  In November 2008, Vinson had no complaints.  Tr. 306.  Vinson had discussions with Dr. Dale about her medication, stating that she wanted to be off her medication.  Tr. 306.  Dr. Dale indicated that she would decrease Vinson's Risperdal in May 2009.  Tr. 306.

In February 2009, Vinson saw Dr. Dale and reported no new complaints.  Tr. 305.  A few months later, in May 2009, Vinson saw Dr. Dale and reported that she was having "some 'extremely difficult times[,]'" had a "terrifying fear of everything[,]" and feared that she was not doing "anything right[.]"  Tr. 304.  Other than reducing prescriptions to deal with $20.00 co-pays, it does not appear that changes were made to Vinson's medications.  Tr. 304.  When Vinson saw Dr. Dale in August 2009, Vinson was feeling within normal limits.  Tr. 283, 303.  In December 2009, Vinson reported that she still had ups and downs but she informed Dr. Dale that she wanted to stop taking Risperdal.  Tr. 302.  On down days, Vinson indicated that she just watched television.  Tr. 302.  Dr. Dale reduced Vinson's Risperdal.  Tr. 302.

With the exception of noting in November 2011 that she was concerned about the future (Tr. 296), throughout 2010 and continuing through May 2012, Vinson continued to see Dr. Dale and was stable and doing well (Tr. 295-301).  During a May 2011 visit with Dr. Dale, Vinson indicated that she was hoping to find work.  Tr. 297.   In November 2012, two months after Vinson's date last insured, Dr. Dale's treatment notes reflect an increase in symptoms.  Tr. 374.  Dr. Dale observed that Vinson had a depressed and anxious mood and poor insight.  Tr. 374.

Vinson denied hallucination but was delusional.  Tr. 374.  In early 2012, Vinson was admitted to the psychiatric unit at Southwest due to suicidal thoughts.  Tr. 375, 386-400.  Vinson was very unhappy with her marriage.  Tr. 395.  She had gotten to the point of having suicidal thoughts with a plan to overdose on her medication.  Tr. 395.  She was released on December 16, 2012. Tr. 398.  On discharge, Vinson's diagnosis was bipolar affective disorder, depressed phase, severe with psychotic features, with a GAF of 55.  Tr. 398.  On December 19, 2012, Vinson saw her primary care physician, Candace Zubricky, M.D., for follow up.  Tr. 375-377.  Vinson reported to Dr. Zubricky that she had lost confidence in Dr. Dale and did not want to return to see her.  Tr. 375-377.  Dr. Zubricky noted that Vinson's manic episode seemed to have abated but urged Vinson to see her psychiatrist.  Tr. 376-377.  Treatment notes reflect that Vinson saw a medical provider for her mental health issues on a few occasions in early 2013.[6]  Tr. 401-404, 406-407.

### 2.    Opinion evidence

#### a.  Treating source

On November 26, 2012, after Vinson's date last insured, Dr. Dale completed a "Medical Source Statement: Patient's Mental Capacity."  Tr. 372-373.  Dr. Dale rated Vinson's abilities in the areas of making occupational adjustments, intellectual functioning, and making personal and social adjustments.  Tr. 372-373.  The rating categories were "unlimited/very good," "good," "fair," and "poor."[7]  Tr. 372-373.  Of the twelve categories within the area of making occupational adjustments, Dr. Dale rated Vinson's abilities as "fair" in four categories – (1)

---

[6] Plaintiff's brief indicates that one or more of these 2013 visits were with Dr. Dale.  Doc. 19, pp. 6-7 (referencing Tr. 401, 403, 406).  However, the signatures on the treatment records do no clearly indicate that Dr. Dale was the treatment provider.

[7] "Unlimited or Very Good" means that the individual's "[a]bility to function . . . is more than satisfactory."  Tr. 372.  "Good" means that the individuals "[a]bility to function is . . . satisfactory."  Tr. 372.  "Fair" means that the individual's "[a]bility to function . . . is moderately limited but not precluded.  May need special consideration and attention."  Tr. 372.  "Poor" means that the individual's "[a]bility to function is significantly limited."  Tr. 372.

follow work rules; (2) maintain regular attendance and be punctual within customary tolerance; (3) relate to co-workers; and (4) interact with supervisors.  Tr. 372.  In the remaining eight categories within the area of making occupational adjustments – (1) use of judgment; (2) maintain attention and concentration for extended periods of 2 hour segments; (3) respond appropriately to changes in routine settings; (4) deal with the public; (5) function independently without special supervision; (6) work in coordination with or proximity without being unduly distracted or distracting; (7) deal with work stress; and (8) complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods – Dr. Dale rated Vinson's abilities as "poor."  Tr. 372-373.

In the three categories in the area of intellectual functioning – (1) understand, remember and carry out complex job instructions; (2) understand, remember and carry out detailed, but not complex job instructions; and (3) understand, remember and carry out simple job instructions – Dr. Dale rated Vinson's abilities as "fair."  Tr. 373.

In the area of making personal and social adjustments, Dr. Dale rated Vinson's abilities as "fair" in three categories – (1) maintain appearance; (2) management of funds/schedules; and (3) ability to leave home on own.  Tr. 373.  In the remaining three categories within the area of making personal and social adjustments – (1) socialize; (2) behave in an emotionally stable manner; and (3) relate predictably in social situations – Dr. Dale rated Vinson's abilities as "poor."  Tr. 373.

When asked to provide medical/clinical findings to support her assessment and any other comments or limitations, Dr. Dale stated "Patient currently in severe relapse of psychotic symptoms."  Tr. 373.

### b.  Consultative examining psychologist

On March 22, 2012, Thomas M. Evans, Ph.D., Psychologist, saw Vinson for the purpose of conducting a psychological evaluation.  Tr. 287-292.  Vinson reported that she considered herself an alcoholic, stating that she stopped using alcohol in 1983 when she went to AA but started using alcohol seven or eight years earlier.  Tr. 288.  She consumed one or two bottles of wine each week.  Tr. 288.  She had used marijuana a few times, with her last use being in 1978.  Tr. 288.

With respect to her work history, Vinson reported that she had gotten along "fine" with coworkers and people in general.  Tr. 288.  She indicated that she handled typical work place stressors "very well."  Tr. 288.  However, she stated that, "from day one[,]" her psychiatric symptoms had affected her work, stating that she had "been at work and felt terrified before[.]"  Tr. 288-289.

Dr. Evans noted that Vinson had been voluntarily hospitalized on two prior occasions for psychiatric reasons, once in 2005 for one week and once in 2008, also for one week.  Tr. 289.  Vinson explained that she had been under the care of a psychiatrist, Dr. Dale, since 2006.  Tr. 289.  She had received mental health counseling for four years but stopped going two years prior.  Tr. 289.  Vinson stated she started having symptoms of depression about 30 years earlier but had felt okay.  Tr. 289.  Over the past year, she reported having one or two good days out of seven.  Tr. 289.  She reported a depressed mood and fatigue and also reported rare manic episodes, which lasted about one week.  Tr. 289.

Dr. Evans's mental status findings were generally normal.  Tr. 289-290.  For example, Vinson's observed mood was euthymic and her affect was consistent with mood.  Tr. 290.  Vinson reported her sleep was terrible but indicated that she had been feeling good lately

7

because the weather had been nice.  Tr. 290.  Vinson reported only "typical worries" such as finances and denied symptoms of anxiety.  Tr. 290.  Dr. Evans observed no evidence of psychosis and Vinson denied auditory and visual hallucinations.  Tr. 290.  Also, Vinson's "[t]hought content was absent of delusional ideation."  Tr. 290.

Dr. Evans diagnosed Vinson with bipolar disorder, not otherwise specified, and assessed a GAF of 60.[8]  Tr. 290.  He opined that Vinson's prognosis was good, noting that her symptoms appeared to be well controlled with medication.  Tr. 290-291.  Dr. Evans indicated that he was advancing a diagnosis of bipolar disorder, not otherwise specified, "only because she [had] been previously diagnosed with this condition and medicated for it."  Tr. 291.  Dr. Evans also indicated that, while Vinson had described herself as an alcoholic and reported that she had stopped drinking for 29 years but started drinking about seven years previously, he was not advancing a diagnosis of alcohol abuse since she had reported no problems in terms of relationships or meeting responsibilities.  Tr. 291.  He also noted that she had not had a DUI.  Tr. 291.

In assessing Vinson's functional abilities, Dr. Evans noted no limitations in Vinson's ability to understand, remember and carry out instructions; no limitations in her ability to maintain attention and concentration and in her ability to maintain persistence and pace to perform simple and multi-step tasks; no limitations in her ability to respond appropriately to supervision and coworkers in a work setting.  Tr. 291-292.  With respect to Vinson's ability to respond appropriately to work pressures in a work setting, Dr. Evans noted that Vinson reported

---

[8] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

that she was very uncomfortable at work and had felt terrified before but was able to get through a typical school day and did not frequently call in sick or have to leave early.  Tr. 292.

### c.   State agency reviewing psychologists

On March 30, 2012, state agency reviewing psychologist Vicki Warren, Ph.D., offered her opinion regarding Vinson's mental health impairments.  Tr. 63-64, 65-66.  Dr. Warren opined that Vinson had a severe impairment, i.e., affective disorder, but her impairment did not satisfy a Listing.  Tr. 63-64.  She opined that Vinson's impairment resulted in mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  Tr. 64.  There were no episodes of decompensation of an extended duration.  Tr. 64.  In assessing Vinson's mental residual functional capacity, Dr. Warren opined that in the area of understanding and memory, Vinson had moderate limitations in her ability to understand and remember detailed instructions.  Tr. 65. Dr. Warren explained that Vinson appeared to have trouble with stress tolerance and would perform best at jobs that did not have a rapid work pace or complex instructions.  Tr. 65.  In the area of concentration, persistence or pace, Dr. Warren opined that Vinson was moderately limited in her ability to carry out detailed instructions, moderately limited in her ability to maintain attention and concentration for extended periods, and moderately limited in her ability to complete a normal workday and workweek without interruptions for psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 65-66.  She explained again that Vinson appeared to have trouble with stress tolerance and would perform best at jobs that did not have a rapid work pace.  Tr. 66.  Dr. Warren opined that Vinson had no limitations in the areas of social interaction and adaptation. Tr. 66.

Upon reconsideration, on August 31, 2012, state agency reviewing psychologist Bruce Goldsmith, Ph.D., offered his opinion as to Vinson's mental impairments.  Tr. 76-77, 79-80. Like Dr. Warren, Dr. Goldsmith opined that Vinson's impairment did not satisfy a Listing but resulted in mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  Tr. 76. There were no episodes of decompensation of an extended duration.  Tr. 76.  In assessing Vinson's mental residual functional capacity, Dr. Goldsmith concluded that Vinson had no limitations in the area of understanding and memory (Tr. 79) and no limitations in social interaction (Tr. 80).  In the area of concentration, persistence or pace, Dr. Goldsmith opined that Vinson was moderately limited in her ability to carry out detailed instructions, moderately limited in her ability to maintain attention and concentration for extended periods, and moderately limited in her ability to complete a normal workday and workweek without interruptions for psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 79-80.  Like Dr. Warren, he explained that Vinson appeared to have trouble with stress tolerance and would perform best at jobs that did not have a rapid work pace.  Tr. 80.  Dr. Goldsmith also opined that Vinson had limitations in the area of adaptation, finding that she was moderately limited in her ability to respond appropriately to changes in the work setting and explained that Vinson would be limited to routine tasks with infrequent changes.  Tr. 80.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

Vinson was represented at and testified at the hearing.  Tr.  29, 30-36, 46-47.  Vinson explained that she stopped working as a teacher in July 2009.  Tr. 31.  She was diagnosed with

bipolar disorder in 2006.[9]  Tr. 32.  Vinson indicated that her bipolar disorder causes her to frequently deal with extraordinary and debilitating fear and anxiety.  Tr. 32.  She suffers from depression and also has manic periods.  Tr. 36.  When Vinson is experiencing a manic period, she has more energy and feels as if she can accomplish many things and that wonderful things are going to happen.  Tr. 36.  During manic periods she avoids making decision.  Tr. 36.  Even if she is feeling happy, she thinks to herself, "well, you're bipolar, you know, you're not really happy."  Tr.  36.

Vinson is able to prepare meals, clean and do laundry.  Tr. 33.  She is able to drive.  Tr. 33.  She drives to the grocery store, to visit with her son, to go to a nearby park where she walks, and to go to medical appointments.  Tr. 33.  Vinson indicated that she has all week to complete her chores and grocery shopping so, if she is not having a good day, she can postpone her chores until another day.  Tr. 34.  On average, she has about one bad day per week, which includes being afraid to be in public.  Tr. 34.  When Vinson has a bad day she stays in her house.  Tr. 34. She is not certain what triggers a bad day but noted that sometimes the receipt of bad news triggers a bad day.  Tr. 34.  Vinson watches television, reads, and uses the computer.  Tr. 35. She has a Facebook account with about 27 friends.  Tr. 35.  On occasion, she socializes with people in person.  Tr. 35.  Vinson's husband works at the Play House so they go to some plays. Tr. 35.  At the time of the hearing and for approximately two or three years, Vinson was volunteering once a week tutoring adults working towards getting their GED.  Tr. 35.  During the time that she had been volunteering, Vinson estimated missing her volunteer appointments 25% of the time due to her mental impairment impacting her ability to do things.  Tr. 46-47.

---

[9] Vinson also has a condition known as rhinophyma which enlarges her nose.  Tr. 32.  She also has asthma.  Tr. 32.

2.     **Medical expert**

Richard W. Cohen, M.D., a board certified psychiatrist, testified at the administrative hearing as a medical expert ("ME").  Tr. 37-46, 47, 131-132.  Dr. Cohen testified that Vinson's bipolar disorder was a severe impairment.  Tr. 38-39.   Dr. Cohen indicated that Vinson had no impairment in activities of daily living and mild impairments in both social functioning and in maintaining concentration, persistence or pace.  Tr. 40.  Dr. Cohen also indicated that Vinson had no episodes of decompensation of extended duration, i.e., over two weeks.  Tr. 41-42.  Dr. Cohen stated that Vinson recompensates quickly.  Tr. 42.

Dr. Cohen noted that Vinson had a prior history of alcoholism until 1983.  Tr. 41.  Dr. Cohen indicated that Vinson does still drink but it was opinion that she should not be drinking in light of the psychotropic medication she was taking. Tr. 41.  Dr. Cohen acknowledged that Vinson's healthcare providers had not told her not to drink alcohol. Tr. 41-42.

The ALJ asked the ME to opine as to Vinson's residual functional capacity.  Tr. 43.  In response, Dr. Cohen opined that Vinson could do at least simple, repetitive tasks in a low stress setting.  Tr. 43.  Dr. Cohen indicated that a low stress setting would mean no assembly line work and no work involving negotiation or arbitration with other people.  Tr. 44.

Dr. Cohen indicated that there were periods of time in the past when Vinson had been delusional, frightened and overwhelmed with anxiety, such that she might be absent from work more than most people.  Tr. 45-46.  He observed that these periods occurred three times in the prior seven years but indicated that he would like more information from Vinson regarding how many times she experienced such episodes.  Tr. 45-46.  The ALJ made further inquiry of Vinson (Tr. 46-47) and, based on Vinson's testimony that she can get so overwhelmed at times that she

is unable to get out of the house 25% of the time to attend to her volunteer activity, Dr. Cohen

opined that her impairment likely satisfied Listing 12.04(C)(2).[10] (Tr. 47).[11]   In response to

questioning by Vinson's counsel, Dr. Cohen indicated that medical records from Dr. Dale were

consistent with Vinson's testimony that she would miss time from work.  Tr. 54-56 (citing to

Exhibit 2F, pp. 8, 9, 11 and Exhibit 10F, p. 3).

### 3.    Vocational Expert

 Vocational Expert ("VE") Timothy L. Shaner testified at the hearing.  Tr. 47-54, 130.

The VE described Vinson's past work as a teacher as a light, SVP 7[12] job.  Tr. 48-49.  From

1985 until 1998, Vinson worked as an office clerk.  Tr. 49.  Since Vinson worked in that position

on a part-time basis – nine hours per week – the VE did not consider that position as past

relevant work. Tr. 49.

The ALJ asked the VE to consider a hypothetical individual of the same age and with the

same education and past work experience as Vinson who could not and cannot perform work in

an environment where there is exposure to fumes, chemicals, dust or agricultural or landscaping

---

[10] Listing 12.04(C)(2) – Affective Disorders refers to:

> Medically documented history of a chronic affective disorder of at least 2 years' durations that has
> caused more than a minimal limitation of ability to do basic work activities, with symptoms or
> signs currently attenuated by medication or psychological support, and one of the following:
>
> ***
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal
> increase in mental demands or change in the environment would be predicted to cause the
> individual to decompensate; or
>
> ***

*See* 20 C.F.R. pt. 404, Subpt. P, App. 1

[11] Dr. Cohen had originally opined that he did not believe that Vinson's impairment met or medically equaled
Listing 12.04. Tr.  39-46.

[12] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.
Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the
skill level definitions  in 20 C.F.R. § 404.1568, unskilled work corresponds to an SVP of 1-2; semi-skilled work
corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

pollens in concentrations that exceed what would be in the environment outside of or away from the workplace; could perform simple, low stress work only; could not and cannot do work involving high or strict production quotas; could not and cannot do assembly line work or piece rate work; could not and cannot do work involving negotiation, arbitration, concentration or other intense, interpersonal interactions with the public, coworkers, or supervisors; could not and cannot manage or supervise other people; could not and cannot do work being responsible for the health, safety or welfare of other people.  Tr. 50-51.  The VE indicated that the described individual could not perform Vinson's past work as a teacher because the occupation of a teacher is considered to entail more than simple and low stress work and it would require supervision of others, i.e., students.  Tr. 51.   The VE indicated, however, that there would be unskilled work at all exertional levels that the described individual could perform.  Tr. 51.  For example, (1) housekeeping, a light exertion job with 13,000 jobs available in the State of Ohio and 377,000 nationally; (2) cashier, a light exertion job with 49,000 available in the State of Ohio and 1,135,000 nationally; and (3) kitchen helper (dishwasher position), a medium exertion job with 12,000 available in the State of Ohio and 282,000 nationally.  Tr. 51-53.

For his second hypothetical, the ALJ asked the VE to assume the same individual described in the first hypothetical with the additional limitation of being absent from work on average at least three times per month because of impairments.  Tr. 53-54.  The VE indicated that, with that level of absenteeism, there would be no jobs in the regional or national economy for the hypothetical individual.  Tr. 54.

At the close of the administrative hearing, the ALJ provided Vinson's counsel with an opportunity to submit a post-hearing memo regarding the issue of whether the evidence supported an RFC consistent with the first or second hypothetical.[13]  Tr. 56-57.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[14] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a

---

[13] Vinson's counsel submitted a post-hearing memo on July 29, 2013.  Tr. 134-135.

[14] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

listed impairment,[15] claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his September 19, 2014, decision, the ALJ made the following findings:[16]

1.   Vinson was insured for a period of disability and disability insurance benefits on the July 30, 2009, alleged onset date, and she remained eligible for these benefits through September 30, 2012.  Tr. 11.

2.   Vinson did not engage in disqualifying substantial gainful activity at any time between July 30, 2009, the alleged onset date, and September 30, 2012, when she was last insured for a period of disability and disability insurance benefits.  Tr. 11.

3.   Vinson had the following severe impairments between July 30, 2009, the alleged onset date, and September 30, 2012, when she was last insured for a period of disability and disability insurance benefits: bipolar

---

[15] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[16] The ALJ's findings are summarized.

disorder not otherwise specified, alcohol dependence, and asthma.[17]  Tr. 12.

4.      Between July 30, 2009, the alleged onset date, and September 30, 2012, when she was last insured for a period of disability and disability insurance benefits, Vinson did not have an impairment or combination of impairments that met or medically equaled a Listing.  Tr. 13-15.

5.      Between July 30, 2009, the alleged onset date, and September 30, 2012, when she was last insured for a period of disability and disability insurance benefits, and with the exception of briefer periods of less than 12 continuous months, Vinson retained the RFC to perform all basic work activities subject to the following restrictions and limitations: she could not perform work in an environment where there is exposure to fumes, chemicals, dust, or agricultural or landscaping pollens in concentrations that exceed what would be in the environment outside of or away from the workplace; could do simple, low stress work only; could not do work involving high or strict production quotas; could not do assembly line work or piece rate work; could not do work involving negotiation, arbitration, confrontation, or other intense interpersonal interactions with the public, coworkers, or supervisors; could not manage or supervise other people; and could not do work involving her being responsible for the health, safety or welfare of other people.  Tr. 16-20.

6.      Between July 30, 2009, the alleged onset date, and September 30, 2012, when she was last insured for a period of disability and disability insurance benefits, Vinson was unable to perform her past relevant work. Tr. 20.

7.      Vinson was born in 1955.  Tr. 20.  During the period between July 30, 2009, and September 30, 2012, Vinson's status changed from an individual closely approaching advanced age, to an individual of advanced age.  Tr. 20.

8.      Vinson had a high school education and was able to communicate in English.  Tr. 20.  Vinson's education did not provide for direct entry into skilled work that she could do consistent with the RFC assessed by the ALJ.  Tr. 20.

9.      Vinson's acquired job skills were not transferable to any work that she could do.  Tr. 20.

10.     Considering Vinson's age, education, work experience and RFC, there are   jobs that existed in significant numbers in the economy that Vinson was able to perform between July 30, 2009, the alleged onset date, and

---

[17] The ALJ found other impairments to be non-severe.  Tr. 12.

September 30, 2012, when she was last insured for a period of disability and disability insurance benefits, including housekeeper, cashier, and kitchen helper.  Tr. 21.

Based on the foregoing, the ALJ determined that Vinson was not under a disability at any time between July 30, 2009, the alleged onset date, and September 30, 2012, when she was last insured for a period of disability and disability insurance benefits.  Tr. 22.

### V. Parties' Arguments

Vinson contends that the ALJ erred in giving no weight to the opinion of her treating psychiatrist, Dr. Dale.  Doc. 19, pp. 9-12.  Vinson also argues that the ALJ erred with respect to the weight the ALJ assigned to the opinion of Dr. Cohen, the medical expert who testified at the administrative hearing, arguing that the ALJ erred in giving no weight to Dr. Cohen's opinion that Vinson would miss more than three days of work per month.  Doc. 19, pp. 12-14.  Vinson also argues that the ALJ erred in finding alcohol dependence to be a severe impairment at Step Two and/or failing to account for such an impairment in the RFC and/or failing to conduct the appropriate materiality analysis under 20 C.F.R. § 404.1535.  Doc. 19, pp. 14-15.

In response, the Commissioner argues that the ALJ adequately explained the weight assigned to the opinion evidence and substantial evidence supports the ALJ's evaluation of the opinion evidence.  Doc. 23, pp. 8-13.  The Commissioner also argues that the ALJ committed no error when determining Vinson's severe impairments.  Doc. 23, pp. 13-14.   Alternatively, the Commissioner contends that any error at Step Two was harmless because the ALJ considered the impact of Vinson's bipolar disorder along with her other impairments at subsequent steps of the sequential evaluation.  Doc. 23, pp. 13-14.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.    The ALJ properly weighed Dr. Dale's opinion

Vinson challenges the ALJ's evaluation of Dr. Dale's medical opinion, arguing that the ALJ failed to adhere to the treating physician rule when analyzing Dr. Dale's opinion.  Vinson contends that the ALJ's decision to provide no weight to Dr. Dale's opinion is not supported by

good reasons as required by the treating physician rule and is not supported by substantial evidence.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

After discussing details of Vinson's mental health treatment records and daily activities, the ALJ considered and weighed the medical opinion evidence.  Tr. 13-19.  With respect to Dr. Dale's opinion, the ALJ explained:

> I gave no weight to the opinions of a treating psychiatrist, Diane Dale, M.D., that were prepared after the July 30, 2009 alleged onset date on November 26, 2012 (see Ex. 10F).  This is because Dr. Dale's opinions were based on the claimant's condition at that time, a period when claimant was no longer eligible for a period of disability and disability insurance benefits.  Dr. Dale's opinions were also offered after the claimant had an exacerbation of her symptoms in late November 2012 (see Exs. 9F, p. 36; 11F, p. 1; and 12F, pps. 2, 3, 13, 15, 16, and 18 to 22). In other words, Dr. Dale's opinions reflect the claimant's condition as of when Dr. Dale signed the report marked as exhibit 10F, but it does not reflect the claimant's overall longitudinal condition between the July 30, 2009 alleged onset date and September 30, 2012 when she was last insured for a period of disability and disability insurance benefits.

Tr. 18.

Contrary to Vinson's claim, the ALJ's evaluation of Dr. Dale's opinions does not run afoul of the treating physician rule.   Here, the ALJ explained that his decision to assign no weight to Dr. Dale's opinions was based in part on the fact that the opinions were offered after Vinson's date last insured.  Tr. 18.   Further, the ALJ concluded that Dr. Dale's opinion did not reflect Vinson's "overall longitudinal condition" during the relevant time period, i.e., July 30, 2009, the alleged onset date and September 30, 2012, Vinson's date last insured.  Tr. 18.  Vinson contends that the ALJ offered no evidence to support this conclusion. Doc. 19, p. 11.  However, Dr. Dale's functional assessments, presented in a check-box style form, were offered at a time when, according to Dr. Dale, Vinson was "in severe relapse of psychotic symptoms."  Tr. 18, 373.   Moreover, Vinson has not shown how Dr. Dale's opinions, which she offered at a time when Vinson was "in severe relapse of psychotic symptoms," provide insight into Vinson's condition prior to that time.  *See e.g., Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("[E]vidence of medical condition after insurance cutoff must be considered to the extent it illuminates claimant's health before that date.") (citing *Martonik v. Heckler*, 773 F.2d 236, 240-241 (8th Cir. 1985)); *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 506 (6th Cir. 2013) ("[T]he ALJ explained that the questionnaire—created well after the date last insured—likely

described a deterioration in [claimant's] condition, rather than [claimant's] condition during the time period in question.").

Vinson also suggests that the ALJ committed reversible error because he did not acknowledge that Dr. Dale was the only specialist to treat Vinson for a significant period of time, saw Vinson regularly, prescribed Vinson medication, and/or knew about Vinson's hospitalizations.  Doc. 19, p. 11.  However, while the ALJ did not specifically mention the foregoing items, the ALJ discussed and considered Vinson's longitudinal treatment history with Dr. Dale.  Tr. 17.

Considering the foregoing, the Court finds that the ALJ properly and sufficiently explained his decision to provide no weight to Dr. Dale's opinion and his reasons are supported by substantial evidence.

**B.      The ALJ properly weighed Dr. Cohen's opinion**

Vinson contends that the ALJ failed to support his evaluation of Dr. Cohen's medical expert opinion testimony that Vinson would miss more than three days of work per month  with good reasons or substantial evidence.  Doc. 19, pp. 12-14.

As a non-examining psychologist, Dr. Cohen did not have an ongoing treatment relationship with Vinson and therefore his opinion was not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005) ("The regulations define a treating physician as a physician who has provided medical treatment or evaluation and 'who has, or has had, an ongoing treatment relationship' with the claimant.") (citing 20 C.F.R. § 404.1502).    It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527.  *See* 20 C.F.R. § 404.1527(c).

Those factors include (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Id.*  However, the ALJ is not obliged to include in his decision an exhaustive factor-by-factor analysis of the factors.  *See Francis*, 414 Fed. Appx. at 804.

Although Dr. Cohen was not a treating psychologist, consistent with the regulations, the ALJ considered Dr. Cohen's opinion and explained the weight assigned to his opinion, stating:

> To the extent it is argued that the medical expert held the opinion that the claimant's mental impairments would cause her . . . [to] miss work more than three days each month, I give no weight to such an opinion because it was based on the claimant's testimony that she had missed about 25 percent of her tutoring sessions because of her symptoms.  As has already been mentioned, tutoring is a type of teaching; the vocational expert testified that teaching is not simple work and is not low stress work; and the tutoring work the claimant performed involved negotiation and other intense interpersonal interactions.  In other words, the tutoring work the claimant has done is more stressful and complex than the work that claimant's residual functional capacity allowed her to perform between the July 30, 2009 alleged onset date and September 30, 2012 when the claimant was last insured for a period of disability and disability insurance benefits, work that I do not find the claimant would be excessively absent from.

Tr. 19.

Vinson claims that it was improper for the ALJ to reject a non-examining psychologist's opinion when that opinion was based on credible subjective statements of the claimant.  Doc. 19, p. 12.  In making this argument, Vinson suggests that the ALJ's credibility determination was faulty and contends that Dr. Cohen found Vinson's testimony to be sufficient to support his opinion.  Doc. 19, pp. 12-14.  However, Vinson's claim that the ALJ erred in assessing her credibility is conclusory and therefore the Court need not review that claim.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).  Also, to the extent Vinson claims that, because Dr. Cohen found Vinson's testimony sufficient, the ALJ was bound to find it credible, she has failed to provide legal authority to support such a claim.  Furthermore, it is the responsibility of the ALJ to assess a claimant's credibility.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("[A]n ALJ is charged with the duty of observing a witness's demeanor and credibility.").

Vinson also argues that the ALJ leaped to the conclusion that the type of work that Vinson said she was missing approximately 25% of the time, i.e., tutoring work, was different from the work described in the RFC.  Doc. 19, pp. 12-13.  However, the ALJ fully explained his reasoning. Further, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a); 404.1546(c).  It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  In assessing a claimant's RFC, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

As a non-examining psychologist, Dr. Cohen's opinion was not entitled to special deference.  Moreover, the ALJ fully explained his reasons for providing no weight to Dr. Cohen's opinion and Vinson has failed to demonstrate error on the part of the ALJ with respect to his analysis of Dr. Cohen's opinion.

**C.      Reversal and remand is not warranted for further evaluation of the ALJ's determination that one of Vinson's severe impairments was alcohol dependence**

Vinson contends that the ALJ erred in finding alcohol dependence to be a severe impairment at Step Two and/or failing to account for such an impairment in the RFC and/or failing to conduct the appropriate materiality analysis under 20 C.F.R. § 404.1535.  Doc. 19, pp. 14-15.

First, to the extent that the ALJ erred in finding alcohol dependence to be a severe impairment at Step Two, Vinson has failed to show harm resulting from that finding.

Second, Vinson contends that the ALJ failed to include limitations in the RFC to account for the severe impairment of alcohol dependence.  However, she fails to indicate what additional limitations beyond those included in the RFC should have been included to account for a severe impairment, i.e., alcohol dependence, which Vinson herself contends should not have been deemed to be a severe impairment.

Third, Vinson's claim that the ALJ failed to properly analyze the materiality of her alcohol dependence under 20 C.F.R. § 404.1535 is without merit.  Analysis under 20 C.F.R. § 404.1535 is only required if a claimant is found to be disabled.  *See* 20 C.F.R. § 404.1535(a) ("*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.") (emphasis supplied).  Here, the ALJ did not find that Vinson was disabled.  Accordingly, analysis under 20 C.F.R. § 404.1535 was not triggered.

For the reasons set forth herein, reversal and remand is not warranted for further analysis with respect to alcohol dependence as a severe impairment.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: July 27, 2016

Kathleen B. Burke
United States Magistrate Judge